**G.M.W., INC., Plaintiff,**

v.

**FLAMBEAU PAPER CORP., d/b/a Flambeau Paper Co., Defendant.**

No. 85–C–339–S.

United States District Court,
W.D. Wisconsin.

Dec. 9, 1985.

**474**

Steven L. Stolper, Polacheck & Harris, Milwaukee, Wis., for plaintiff.

Michael S. Varda, DeWitt, Sundby, Huggett, Schumacher & Morgan, Madison, Wis., for defendant.

## MEMORANDUM AND ORDER

SHABAZ, District Judge.

On November 7, 1985, this diversity action for monetary relief was tried before the Court. The Court has jurisdiction pursuant to 28 U.S.C. § 1332.

## FINDINGS OF FACT

The plaintiff G.M.W., Inc., a Minnesota corporation, is a Chapter 7 debtor, having filed its petition for relief on April 12, 1983. It was formerly engaged in the business of freight hauling, with its principal office and place of business located at 800 Norwest Bank Center, St. Paul, Minnesota.

The defendant Flambeau Paper Corp., d/b/a Flambeau Paper Co., is a Wisconsin corporation with its principal offices and place of business at Park Falls, Wisconsin, engaged in the manufacture of printing paper other than newsprint.

Between April 17, 1980, and March 9, 1983, plaintiff provided transportation services to the defendant, during which time plaintiff was a common carrier regulated by the Interstate Commerce Commission (ICC).

During this period 173 shipments occurred for which plaintiff seeks from defendant the additional amount of $22,729.21 in undercharges for freight hauling services.

The bills of lading which correctly describe the items shipped, origins, destinations, and dates the items were placed for shipping with plaintiff by the defendant were received in evidence without objection in the following categories:

| | |
|---|---|
| Exhibit A, consisting of those shipments to the Twin Cities, refers to the posted tariff appropriate to those shipments, and totals | $15,929.27 |
| Exhibit B, consisting of those shipments to Chicago, refers to the posted tariff appropriate to those shipments, and totals | 2,827.06 |
| Exhibit C, consisting of those shipments to Chanhassen, Minnesota, refers to the posted tariff appropriate for those shipments, and totals | 2,799.26 |
| Exhibit D, consisting of miscellaneous shipments, refers to the posted tariffs appropriate for those shipments, and totals | 1,058.30 |
| Exhibit E, consisting of further miscellaneous shipments, refers to the posted tariffs appropriate for those shipments, and totals | 115.32 |

For a total claimed undercharge of $22,729.21 For which the defendant denies liability.

The defendant's liability for undercharges on these numerous (173) freight shipments is grounded on those provisions set forth in 49 U.S.C. §§ 11706(a) and (g):

**§ 11706. Limitation on actions by and against common carriers**

(a) A common carrier providing transportation or service subject to the jurisdiction of the Interstate Commerce Commission under chapter 105 of this title must begin a civil action to recover charges for transportation or service provided by the carrier within 3 years after the claim accrues.

    \*    \*    \*    \*    \*    \*

(g) A claim related to a shipment of property accrues under this section on delivery or tender of delivery by the carrier.

This time is extended for an additional two years because of the plaintiff's debtor proceedings.

**11 U.S.C. § 108. Extension of time**

(a) If applicable nonbankruptcy law, an order entered in a nonbankruptcy proceeding, or an agreement fixes a period within which the debtor may commence an action, and such period has not expired before the date of the filing of the petition, the trustee may commence such action only before the latter of—

(1) the end of such period, including any suspension of such period occurring on or after the commencement of the case; or

(2) two years after the order for relief.

The defendant, of course, cries "foul," among other things arguing that because of lapse of time the defendant can no longer recover any undercharges from its customers.

The Court finds, however, that the applicable tariffs have been filed with the ICC and published, as have those commodity rates which are controlling. Further, the rates are not ambiguous, were always available to the defendant for examination, and the bills of lading correctly describe the shipments.

The Court further finds that the plaintiff is within the time requirements for the commencement of this proceeding, but that there existed between the parties an unpublished practice known as "overflow protection" for shipments to Chicago, Chanhassen and the Twin Cities. This standard pattern and practice existing between the parties and the defendant's predecessors for over ten years provided a lower rate than the tariff would have allowed. The defendant, during the period of time it received services from plaintiff, was never advised of the claim now being pursued; the course of dealing between the parties was not for the purpose of promoting rate discrimination, and finally, the course of dealing existing between the parties, if acceptable, would have modified the applicable tariff rates on file with the ICC, and that defendant relied upon those practices existing between the parties.

In spite of defendant's protestations to the contrary and its opposition to the 1915 Supreme Court decision, nonetheless the following is controlling as it concerns the actions of this Court:

Under the Interstate Commerce Act, the rate of the carrier duly filed is the only lawful charge. Deviation from it is not permitted upon any pretext. Shippers and travelers are charged with notice of it, and they as well as the carrier must abide by it, unless it is found by the Commission to be unreasonable. Ignorance or misquotation of rates is not an excuse for paying or charging either less or more than the rate filed. This rule is undeniably strict and it obviously may work hardship in some cases, but it embodies the policy which has been adopted by Congress in the regulation of interstate commerce in order to prevent unjust discrimination.

    \*    \*    \*    \*    \*    \*

Neither the intentional nor accidental misstatement of the applicable published rate will bind the carrier or shipper. The lawful rate is that which the carrier must

exact and that which the shipper must pay. The shipper's knowledge of the lawful rate is conclusively presumed.

*Louisville & Nashville Railroad Company v. Maxwell,* 237 U.S. 94, 35 S.Ct. 494, 59 L.Ed. 853.

■ The following decisions further defeat the defendant's request that this Court exercise legislative as well as equitable pronouncements and adopt the practice of the parties instead of the published tariffs.

This court has previously noted that the anti-discrimination provision in 49 U.S.C. § 6(7) is so strong "that the courts have generally refused to recognize an otherwise justifiable defense of estoppel."

*Missouri Pacific Railroad Company v. Rutledge Oil Company,* 669 F.2d 557 (8th Cir.1982).

Under the Interstate Commerce Act, freight charges incurred pursuant to a filed tariff are accorded a legally superior status; that of a law. The only defense which can be raised to a carrier's suit for these legal charges is that the services have been paid for, that the services were not rendered, that the services were charged under an inapplicable tariff schedule, or that the rates were unreasonable.

*In re Penn Central Transportation Company,* 477 F.2d 841 (3rd Cir.1973).

■ The Court must further determine that the circumstances addressed by the Court in *Consolidated Freightways Corp. of Del. v. Admiral Corp.,* 442 F.2d 56 (7th Cir.1971), are totally different from the fact situation in this case, and for this reason the defense of estoppel is not applicable in light of the previous decisions cited.

In requesting this Court to exercise equitable and legislative powers, rather than the law which may be applicable, defendant's counsel brings to this Court's attention a practice followed by the parties. Defendant argues that the plaintiff should not be allowed to recover undercharges in this situation, for it would amount to an unreasonable practice.

■ The defendant strenuously argues it would not be reasonable for plaintiff to recover according to the applicable rates under the circumstances found to exist. The reasonableness of practice, however, is exclusively within the jurisdiction of the Interstate Commerce Commission, and cannot be addressed to this Court.

In its decision Number 37635, dated March 13, 1985, the ICC recognized its authority to waive undercharges in order to prevent unreasonable practices. In its decision concerning rail carriers, the Commission referred to 49 U.S.C. § 10701(a):

§ **10701. Standards for rates, classifications, routes, rules, and practices**

A ... practice related to transportation or service provided by a carrier subject to the jurisdiction of the Interstate Commerce Commission under chapter 105 of this title must be reasonable....

Upon finding that a practice is unreasonable, we may order the carrier to stop the violation. This language is broad enough to confer on us the power to prevent a carrier from the practice of unreasonably collecting undercharges ...

Nevertheless, there is support for absolving shippers from liability to pay the tariff rate in particularly egregious circumstances.

*The Buckeye Cellulose Corporation v. Louisville & Nashville Railroad Company,* Interstate Commerce Commission, March 13, 1985.

Before making that reference which the Court believes to be appropriate, the doctrine of primary jurisdiction should be briefly discussed.

"The doctrine of primary jurisdiction ... is concerned with promoting proper relationships between the courts and administrative agencies charged with particular regulatory duties." *United States v. Western Pacific Railroad,* 352 U.S. 59, 63, 77 S.Ct. 161, 165, 1 L.Ed.2d 126 (1956) (*Western Pacific*). The doctrine is applicable in federal courts when an action "requires the resolution of issues which,

under a regulatory scheme, have been placed within the special competence of an administrative body." *Id.* at 64, 77 S.Ct. at 165. Application of the doctrine results in suspension of the judicial process "pending referral of such issues to the administrative body for its views." *Id. See also General American Tank Car Corp. v. El Dorado Terminal Co.,* 308 U.S. 422, 433, 60 S.Ct. 325, 331, 84 L.Ed. 361 (1940) (proper procedure is to stay the proceedings).

Whether the doctrine requires the ICC to pass on the construction of a particular tariff's requirements "depends on whether the question raises issues of transportation policy which ought to be considered by the Commission in the interests of a uniform and expert administration of the regulatory scheme laid down by th[e] Act." *Western Pacific,* 352 U.S. at 65, 77 S.Ct. at 166. It is a question of law, reviewable de novo.

*United States v. Yellow Freight System, Inc.,* 762 F.2d 737, 741 (9th Cir.1985).

■ The Court agrees that the primary jurisdiction doctrine does not apply if the ICC has already construed a particular tariff or clarified its underlying factors. To this Court's knowledge, the ICC has never construed the terms of overflow protection, nor the egregious policy followed by the plaintiff in this and similar cases which now appear to fill the Federal Reporter.

The doctrine has been applied, for example, when an action otherwise within the jurisdiction of the court raises a question of the validity of a rate or practice included in a tariff filed with an agency, *e.g., Danna v. Air France,* 463 F.2d 407 (CA2 1972); *Southwestern Sugar & Molasses Co. v. River Terminals Corp.,* 360 U.S. 411, 417–418 [79 S.Ct. 1210, 1214–1215, 3 L.Ed.2d 1334] (1959), particularly when the issue involves technical questions of fact uniquely within the expertise and experience of an agency—such as matters turning on an assessment of industry conditions, *e.g. United States v. Western Pacific R. Co. supra,* at 66–67 [77 S.Ct. at 166].

*Nader v. Allegheny Airlines,* 426 U.S. 290, 96 S.Ct. 1978, 48 L.Ed.2d 643 (1975).

There is indeed an excellent review of the situation analogous to this case in *Western Transportation Company v. Wilson Co., Inc.,* 682 F.2d 1227 (7th Cir.1982) where the Seventh Circuit Court of Appeals gave the shipper a second chance to have those unreasonable circumstances of which it complained reviewed by the Interstate Commerce Commission. Certain portions of that decision are set forth in part as follows:

A common carrier regulated by the Interstate Commerce Commission may not receive a different compensation for its services from the rate specified in the applicable tariff, and if by mistake it charges a lower rate it may sue under 28 U.S.C. § 1337 to recover the undercharge. The carrier's right to recover is quite unaffected by the usual limitations on contract actions based on mistake. "The shipment being an interstate one, the freight rate was that stated in the tariff filed with the Interstate Commerce Commission. The amount of the freight charges legally payable was determined by applying this tariff rate ... [and] thus, they were fixed by law. No contract of the carrier could reduce the amount legally payable; or release from liability a shipper who had assumed an obligation to pay the charges. Nor could any act or omission of the carrier (except the running of the statute of limitations) estop or preclude it from enforcing payment of the full amount by a person liable therefor."

This is a harsh rule. Courts strain against it. A favorite device is to find that a tariff is ambiguous and then interpret it to reach a result that the court considers just. That is what the district court did in this case. The plaintiff, Western Transportation Company, is a motor carrier regulated by the ICC. It went bankrupt, and in connection with its bankruptcy hired a consulting firm to comb through its invoices looking for under charges—with results that are

showing up with increasing frequency in the Federal Reporter. (citations omitted)

After determining that the favored device of ambiguity was of no avail to the defendant, the court then stated at page 1231 as follows:

But it does not follow that the shipper is necessarily without any remedy in a case like this. A tariff provision has to be reasonable. If it is not, it violates the statute; and the Commission, either on its own initiative or on complaint, "shall take appropriate action to compel compliance with" the statute. If the notation requirement is, as it appears to be, entirely pointless, the Commission can be expected to set aside this part of the tariff—thus knocking the props out from under Western's case—if asked to do so. Wilson should have done what Iowa Beef Processors, Inc., another of Western's customers, did when sued by Western in bankruptcy court on the very tariff in issue in this case—ask for a stay of the court proceedings and then ask the Commission to declare the notation requirement unreasonable. The Commission did so. Incidentally, the Commission also found the tariff to be unambiguous—that is why it had to reach the issue of reasonableness—and this finding should have carried great weight with the district court in the present case. (citations omitted)

On November 1, 1985, this Court denied the defendant's motion to refer portions of its objections to the ICC for determination.

The Court was of the opinion that any reference would only partially resolve the matter.

Its further examination of those authorities which have been herein quoted indicates that a reference to the ICC for its determination as to whether or not plaintiff's practices and entire course of conduct was reasonable is the appropriate method for the disposition of this controversy.

■ Rather than to require the defendant to file an appropriate complaint with the ICC concerning the practices of the plaintiff which it believes to be unreasonable, this Court reconsiders its previous denial of reference and now refers the entire matter to the ICC for a determination as to whether plaintiff is engaged in a practice so unreasonable, to include the determination of ambiguity, notwithstanding the finding of this Court, that the undercharges sought should be disallowed.

■ In making this reference, the Court has attempted to determine whether or not it would be appropriate to stay the proceedings until the ICC has made an appropriate determination. This is unnecessary, for any determination made by the Commission may be further reviewed.

Further authority is found for reference and dismissal, rather than a stay, in *Far East Conference v. United States*, 342 U.S. 570, 72 S.Ct. 492, 96 L.Ed. 576 (1952), in which the Supreme Court addressed itself to an analogous situation:

Having concluded ... the present case involves questions within the general scope of the Maritime Board's jurisdiction. An order of the Board will be subject to review by a United States Court of Appeals, with opportunity for further review in this Court on writ of certiorari.... We believe that no purpose will here be served to hold the present action in abeyance in the District Court while the proceeding before the Board and subsequent judicial review or enforcement of its order are being pursued. A similar suit is easily initiated later, if appropriate. Business-like procedure counsels that the Government's complaint should now be dismissed.... (citations omitted)

Accordingly,

## ORDER

IT IS ORDERED that this case is transferred to the Interstate Commerce Commission for its determination as to whether the practice of G.M.W., Inc. is unreasonable to the extent that undercharges will not be allowed recovery.

IT IS FURTHER ORDERED that the defendant shall be responsible for perfecting the record of this reference as though it had initiated the complaint on its own initiative.

IT IS FURTHER ORDERED that upon completion of proceedings before the Interstate Commerce Commission this case may be returned to this Court for that dispositive order which may be appropriate.